**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **PRUCO LIFE INSURANCE COMPANY,** *Plaintiff* | * | **CIVIL ACTION** |
| **VS.** | * | **NO. 15-3250 c/w 15-6946** |
| | * | **SEC. N (3)** |
| **KACIE BREEN & THE ESTATE OF WAYNE EDMOND BREEN,** *Defendants* | * | |

******************************

# ORDER AND REASONS

This matter was commenced pursuant to Rule 22 of the Federal Rules of Civil Procedure,[1] which provides for federal interpleader of funds to which there are competing claims. Jurisdiction, based on 28 U.S.C. § 1332, is uncontested. The matter came on for trial on Monday, March 20, 2017 and Tuesday, March 21, 2017. The Court rules as follows, for the reasons stated herein.

---

[1] **Rule 22. Interpleader**

(a) GROUNDS
  (1) *By a Plaintiff*. Persons with claims that may expose a plaintiff to double or multiple liability may be joined as defendants and required to interplead. Joinder for interpleader is proper even though:
    (A) the claims of the several claimants, or the titles on which their claims depend, lack a common origin or are adverse and independent rather than identical; or
    (B) the plaintiff denies liability in whole or in part to any or all of the claimants.
  (2) *By a Defendant*. A defendant exposed to similar liability may seek interpleader through a crossclaim or counterclaim.
(b) RELATION TO OTHER RULES AND STATUTES. This rule supplements---and does not limit---the joinder of parties allowed by Rule 20. The remedy this rule provides is in addition to---and does not supersede or limit---the remedy provided by 28 U.S.C. 1335, 1397, and 2361. An action under those statutes must be conducted under these rules.

(As amended Dec. 29, 1948, eff. Oct. 20, 1949; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 30, 2007, eff. Dec. 1, 2007.)

## I. STATEMENT OF THE CASE

On March 1, 2015, Kacie Breen (hereinafter sometimes referred to as "Kacie") shot her husband Wayne Breen (hereinafter sometimes referred to as "Wayne" or "Dr. Breen"), resulting in his death. Kacie is the named beneficiary of two life insurance policies taken out by Wayne Breen, one with Pruco Life Insurance Company ("Pruco") and the other with Lincoln National Life Insurance Company ("Lincoln").

Wayne had five children from a prior marriage (referred to collectively herein as "the adult Breen children")[2]; and another adult child from an extra-marital relationship over two decades ago.[3] Following Wayne's death, succession proceedings were opened. Alyce B. Landry ("Landry") was appointed "Independent Adminstratrix", and represents the estate in these proceedings. Kacie Breen, as beneficiary, Alyce B. Landry, as adminstratrix of the estate, and the adult Breen children all are named claimants to the funds placed into the registry of this Court by Pruco and Lincoln.

Disposition of these claims turns on LSA-R.S. 22:901(D)(1), which is Louisiana's version of "The Slayer Rule", i.e., that one cannot financially benefit from killing the insured. Under LSA-R.S. 22:901(D)(1), a beneficiary cannot receive life insurance policy proceeds if she is "(a) held by a final judgment of a court of competent jurisdiction to be criminally responsible for the death, disablement, or injury of the individual insured," or "(b) judicially determined to have participated in the intentional, unjustified killing of the individual insured." As Kacie has been named the beneficiary by Wayne on both of these policies, the burden of proving her disqualification under

---

[2] Bridget Marie Breen Dunbar, Patrick Vernon Breen, Ryan Michael Breen, Devin Thomas Breen and Sean Michael Breen.

[3] On February 6, 2017, Dr. Breen's sixth adult child, Aaron Dylan Knapp, moved to intervene in the proceedings. However, given the impending trial date of March 20, 2017, the motion was denied as untimely.

this statute rests on those seeking to negate her beneficiary status, i.e., the adult Breen children and Landry. Since Kacie has never been charged or convicted to establish criminal responsibility for Wayne's death, this burden requires these claimants to prove that Kacie "participated in the intentional, unjustified killing of the individual insured", her husband Wayne.

## II. FACTUAL BACKGROUND

### A. Wives and Children

Wayne and his first wife, Diana, were married in 1977, and five children were born of this union.[4] During the course of this marriage, Wayne engaged in an affair with a woman named Mary Grace Knapp, with whom he fathered a child, Aaron Dylan Knapp, in or about 1993.[5]

In March 2004, Wayne commenced an affair with Kacie, divorced Diana in 2007, and then married Kacie on December 29, 2007. Kacie and Wayne have one child together, Aiden, born in October, 2008. Aiden was age six on March 1, 2015, the date Wayne died.

### B. The Kacie/Wayne Marriage

The marriage between Kacie and Wayne was frequently turbulent and tempestuous. Indeed, the exhibits in the record chronicle many instances of marital strife.[6] Suffice it to say, over the years there were highs and lows, the latter featuring unfaithfulness on the part of both: Kacie in 2010 and Wayne in 2012. The evidence of record, and the testimony at trial, suggest a relationship of distrust, suspicion and contentiousness. Although several instances described in the St. Tammany Parish Sheriff's Office (STPSO) Investigative Case Report indicate obsessive

---

4 *See* Fn. 2.
5 *See* Fn. 3.
6 *See* Exh. 3, 5, 6, 7, 8, 16, 17, 18.

and domineering conduct by Wayne,[7] his son-in-law Jeffrey Dunbar testified to the contrary, based upon his experience with and observation of his father-in-law and step mother-in-law.[8]

The evidence and testimony further indicate physical abuse committed by Wayne against Kacie (and, on at least one occasion, their son) at various times, giving rise to intervals wherein they split temporarily (he on those occasions would sometimes vacate the matrimonial domicile, she sometimes residing at her mother's house), and reconciled. In July 2009, deputies from the St. Tammany Parish Sheriff's Office ("STPSO") were summoned via 911 to the Breen residence, 85312 Highway 437, Covington, Louisiana, in reference to an incident of domestic violence between Wayne and Kacie. After the 911 call but prior to their arrival, Wayne fled into the wooded area surrounding the residence. Deputies learned that Kacie and Wayne had become involved in an argument, at which time he took her cell phone and threw it to the ground. As the argument became heated, Wayne held Kacie in a headlock and forced her to the ground, causing her to cry for help. Kacie's son Christopher, who entered the room, witnessed the incident, and testified to as much at trial, called 911. Kacie later determined not to pursue the matter, and no charges were filed against Wayne in connection with this incident.

---

[7] *See* Exh. 3, pp. 9, 20-23, 29-30, 48-49, 51, 59-60, 66-67, 76-78.

[8] *See* Exh. 3, pp. 31, 42-43, 45, 50; *see also* Exh. 5, p. 158 (notation of Dr. Leanne Truehart, wherein she quotes Wayne on August 23, 2012 as saying: "She doesn't like to be out of control", in connection with the Orange Beach incident). None of the adult Breen children testified at trial. However, they were interviewed by detectives with the St. Tammany Parish Sheriff's Office. Each described their relationships with Wayne, having varying degrees of distance and estrangement, some closer than others. *See* Exh. 3, p. 18 (Bridget, who did not answer detectives' question whether Wayne "was ever mentally or physically abusive to her or anyone else in the family", "never became upset or cried over the news of her father's death."); Exh. 10 (Bridget's January 8, 2002 letter to Wayne, introduced as Exh. 10); Exh. 3, pp. 42 (Patrick advised "he only spoke with his father a couple of times throughout the year", that "his relationship with his father was not the best", that "Kacie would talk down to his father even in front of other people," and that Wayne "appeared to be submissive towards Kacie for whatever reasons."), 42-43 (Ryan, with whom Wayne seemed closest, said "Kacie talked down to his father"), 44-46 (Sean, who also said "Kacie would make fun of his father in front of him"), and 50-51 (Devin, who said he "was close to his father and Kacie", that Kacie "seemed to belittle his father", but that "his father seemed happy with Kacie.").

Kacie's mother, Cheryl Magee, testified at trial that she saw bruises on Kacie's body "seven or eight times" over the last six or seven years of the marriage. She claimed these bruises appeared on Kacie's arms and legs, once on the neck and chin, and once included a black eye. She stated that Kacie would not say if Wayne struck her or physically abused her, and declined to answer how she got the black eye. She recalled Kacie's explanation that "[Wayne] suffers from PTSD, and is not responsible for his actions." She further stated that Wayne spoke "in very limited terms" about his Vietnam combat experience.[9] Cheryl Magee and Kacie had agreed upon a "safety plan" several years prior to March 1, 2015: "[Kacie] was to call, and if she didn't arrive [at Cheryl's house] in fifteen minutes, [Cheryl] was to call 911." Although Cheryl Magee testified she had not seen Wayne "hot tempered or aggressive", she noted Kacie's response to her questions about the bruises and other physical injury: "Momma, please leave it alone. I can handle it, let it go. Don't tell my daddy."

Another alarming occasion occurred in July 2012, while the couple vacationed in Orange Beach, Alabama, with their young child. On that vacation, Wayne was arrested by the Orange Beach Police Department for domestic violence. The incident, described fully in Exhibits 17 and 18, involved Wayne becoming angry and then grabbing their son by the arm and behind the neck. During this incident, the child received a cut on his lip and bruises. Upon her return to Covington, Kacie sought and obtained, on July 20, 2012, a temporary restraining order against Wayne, by filing a "Petition for Protection from Abuse" in the 22nd Judicial District Court for the Parish of St. Tammany, Docket No. 2012-13999.[10] In the Petition, Kacie recites in writing the Orange Beach

---

[9] Cheryl Magee testified that Wayne spoke of his "tour of duty", "deployment", and being "in the Marines." He also mentioned his combat experience in the context of seeing the movie *American Sniper*, in that the film was "so real, same as in his tour", "killing innocent people, suffering."

[10] *See* Exh. 18.

incident, and further relates "past incidents."[11] Similar to the July 2009 incident, when Wayne fled into the woods, this matter, too, was eventually resolved amicably, with an agreement that the entire court record (including the description of the Orange Beach incident) be sealed.[12] Kacie testified that, upon reconciliation, she and Wayne wanted the court record sealed "to protect Wayne," given his professional status in the community, and to avoid embarrassment.

### C. Wayne's October 14, 2014 Car Accident

On or about October 14, 2014, Wayne was driving his truck on Highway 437, at or near Barcelona Road in St. Tammany Parish, when he had a serious, single-car accident, resulting in injuries to Wayne that included lacerations to the left frontal area of his head and arm. Despite Kacie's suspicion that the accident was alcohol related, toxicology results do not indicate that Wayne was inebriated at the time. Regardless, this accident is of particular significance because it led Kacie to have several conversations with various members of Wayne's family, including his brother, attorney Robert Breen. During one of these conversations, Kacie raised Wayne's Vietnam service and resulting affliction. It was Robert Breen who first suggested to Kacie that Wayne had never been to Vietnam, and that he was unfamiliar with any combat experience Wayne related to others.[13] Kacie also communicated with Wayne's psychiatrist, Dr. Truehart, as referenced below.

### D. The Knapp Matter

In late January 2015, Kacie first learned of the child Wayne fathered with Mary Grace Knapp, causing yet another heated rift. However, the rift appeared to be resolved once Kacie and Wayne seemingly joined in pursuit of terminating a payment arrangement between Wayne and

---

[11] *See* Exh. 18, p. 3.

[12] *See* Exh. 18, pp. 25-27.

[13] In his interview with the STPSO detective, Wayne's son Sean said he "also knew [Wayne] did not serve in the Vietnam War." Exh. 3, p. 45.

Mary Grace Knapp, related to their son, that had been in place, to Kacie's surprise, for over two decades. Needless to say, this stunning revelation caused quite an angry reaction from Kacie, as evidenced in the text messages beginning on February 1, 2015 through February 8, 2015.[14] These vitriolic and at times vulgar text messages evidence the rage of a wife discovering a husband's significant, longstanding lie, and the sheepishness of an embarrassed husband caught by his wife in a monumental deception. Importantly, over time, Kacie's texts turn from initial anger and invective toward Wayne to an emphatic rejection of a claim by Knapp for continued payments.[15] By mid-February, the text exchanges began to focus on a planned vacation to Disney World, on which Kacie and Wayne took their son, Aiden.[16]

**E. Vietnam Vet?**

Critical to the facts of this case is Wayne's persistent representation to most all in his personal and professional life that he had served as a U.S. Marine in the Vietnam War, where he participated in the horrors of combat. Over many years, Wayne asserted that, as a result, he suffered post-traumatic stress disorder (PTSD), which purportedly explained his moodiness, contentiousness, cursing, and explosions of anger sometimes accompanied with outbursts of violence, such as throwing objects.

Early in their relationship, Wayne repeated his claim of being a Vietnam veteran to Kacie, who testified at trial to anecdotes and stories told, in vivid detail, by Wayne about his service,

---

14 *See* Exh. 16.

15 On or about February 8, 2015 and the days following, Kacie's texts to Wayne consist of blunt and at times profane directives as to how he should handle the Knapp situation, including strategy, retention of aggressive counsel, and positions he should take with regard to the continued Knapp claim. Those texts no longer indicate a desire by Kacie for Wayne to leave the domicile, or her intent to leave Wayne, or the desire of either for a divorce, although divorce was referenced in a prior text from Kacie during Wayne's defensive and dissembling explanations on February 4, 2015. *See* Exh. 16, pp. 12, 23.

16 Exh. 16, pp. 134-167.

including events, gruesome and disturbing, that he claimed to have witnessed during the war. According to Kacie's testimony, Wayne awoke on their first night together, screaming from a night terror. Apologetically, Wayne explained that he had "terrible night flashes", "demons in [his] mind", all of which were "part of who he [was]". Kacie stated that, after retrieving Wayne a towel from the bathroom, he told her that he was a kid of 18 or 19, but was nonetheless the most experienced in the platoon, and was considered the leader. He continued that, on one occasion, he was responsible for calling in coordinates for an air attack, and was "devastated that he called in the wrong coordinates, and killed all his men." She further testified that Wayne related an incident in a Vietnam village, while he and his platoon were waiting for an enemy attack, when he had to shoot and kill a pregnant Vietnamese woman. Wayne also told her about one of his Vietnam buddies, "Mackie", whom he claimed saved Wayne's life, in an incident that left a blemish on his back. Kacie testified that she felt sorry for Wayne, and "was devastated for him." She stated that asking Wayne about his Vietnam experience "was taboo with him", and that he didn't want it brought up unless he desired to talk about it.

Kacie's son, and Wayne's stepson, Christopher Hickman corroborated the nature of Kacie's testimony. From the stand at trial, Hickman recalled that Wayne shared combat stories with him, too, including that he had suffered a gunshot wound in the abdomen while fighting in the Vietnam War. On another occasion, according to Hickman, while the two were watching a Vietnam documentary that showed the aftermath of the use of napalm, Wayne said that he could never forget the smell of burning bodies.

It is evident that Wayne also discussed his purported Vietnam service with employees and friends, including Wayne's longtime office employee, Lakeitha Chappell, who was in charge of

billings, accounts receivable, and accounts payable for Dr. Breen's clinic. At her deposition, Chappell testified that Dr. Breen had (presumably military) hats on the top shelf of his office, and "he would always tell me sometimes that that's what keeps him – when he walks into the office every day, the memories from being at war and the hats that he had up on top his cabinet, that he looks at that every day when he comes in."[17] Chappell (also referred to as "Lakeitha Cole" in the St. Tammany Parish Investigative Report), stated that she "remembered Dr. Breen talking about the Vietnam War, and when he did, he seemed to get a little emotional."[18] In addition, Kathy Hoffman, who worked for Wayne for approximately 19 to 20 years, told St. Tammany Parish law enforcement authorities that "Dr. Breen spoke about Vietnam and said he lost a lot of good friends during the war."[19] Finally, Cindy Rayborn, a personal friend of Wayne's and Kacie's, also interviewed by St. Tammany Parish authorities, said "she knew about Wayne being in the Vietnam War" and remembered that "he seemed to have a lot of anger built up inside of him."[20]

Wayne's Vietnam stories did not stop there. He also shared tales of combat experience with his psychiatrist, Dr. Leanne M. Truehardt, whom he began seeing on or around January 16, 2007.[21] Over 250 pages in total, Dr. Truehart's records are rife with notes taken during Wayne's discussion of his Vietnam experience, including references to his combat buddy "Mackie."[22]

Despite all of this, at trial the parties stipulated: "Wayne Breen never served in combat, and never served in Vietnam."[23]

---

[17] Chappel testimony, Exh. 15, p. 48, l. 7-17.
[18] Exh. 3, p. 26.
[19] Exh. 3, p. 25.
[20] Exh. 3, p. 33.
[21] *See* Truehart records, Exh. 5.
[22] *See* Exh. 5, pp. 58, 59, 61, 71-77, 87-88, 93, 95, 106, 114-120, 122, 128-129, 131-135, 137-138, 140, 146, 179, 188, 196, and 247.
[23] *See* Rec. Doc. 79, No. 4.

**F. Wayne's Workplace Conduct**

In 2006, while working as a physician at St. Tammany Parish Hospital ("STPH"), Wayne was the subject of multiple complaints from hospital staff pertaining to his "aggressive behavioral problems."[24] As a result of these complaints, on December 28, 2006, STPH administrator Dr. David Cressy, with authority of the STPH Medical Executive Committee, ordered Wayne to submit to a psychiatric evaluation.[25] In his letter, Dr. Cressy cited Wayne's "disruptive conduct in the past", and "abusive and derogatory behavior", which Dr. Cressy described as "unacceptable."[26] Out of two options, Wayne chose to be interviewed and treated by psychiatrist Dr. Leanne Truehart.

In a January 16, 2007 letter referring Wayne to Dr. Truehart, Dr. Farhad Aduly, Chief of Staff of STPH, described Wayne's longstanding "pattern of disruptive conduct . . . which has included verbally abusive and derogatory behavior toward Hospital staff . . . ."[27] Dr. Aduly enclosed three letters of complaint written by members of the hospital staff, in which Wayne is described as: "cursing and yelling", complainant nurse "being yelled out, cursed and hung up on", "chewing [nurse] out in the birth room" while a patient was laboring, "belittling of individual staff members' capabilities", "threats against nurses", and "fear by staff members of Dr. Breen." They also describe incidents where Dr. Breen tore an order out of a chart and threw it; "unethical and

---

[24] *See* Exh. 3, p. 76.

[25] Wayne was to seek treatment for anger management at the Vanderbilt Physicians Pulse Program, a workplace behavioral assessment program. Although Wayne successfully completed the program, he eventually stopped practicing at STPH. After leaving STPH, Wayne began practicing at the Lakeview Regional Medical Center ("LRMC"). Wayne was again the subject of several complaints from members of the hospital staff at LRMC. These complaints were determined not to be serious in nature, and he was allowed to continue his practice at LRMC. *See* Exh. 3, p. 76.

[26] Exh. 5, pp. 1-2.

[27] Exh. 5, p. 5.

verbally violent behavior, truly unraveling at the seams"[28], and "screaming loudly at everyone, looked like a mad man, in a maniac state, irrational behavior, and that 'everyone in the room felt the blow of his rage and fiery (sic).'"[29] The third complainant similarly described Dr. Breen's "disruptive, abusive behavior, episodes of yelling and cursing, and that nurses and staff are berated in front of patients and their peers. I have seen the whole unit run based on Dr. Breen's mood that day."[30]

### G. Treatment by Dr. Truehart

Wayne visited Dr. Truehart for the first time on January 18, 2007. Her records span the remainder of his life, with a final entry dated February 6, 2015, wherein he cancelled an appointment for the third time. Dr. Truehart discussed a variety of topics with Wayne, including not only his Vietnam combat experience, but also depression, consumption of alcohol, his workplace conduct and his family relationships, particularly with his children. Dr. Truehart's handwritten notes reflect each of these discussions over the years; and these visits are usually memorialized in a typewritten document recording a clinical "Diagnostic Assessment." Beginning on or about February 14, 2008, Dr. Truehart recorded a "Diagnostic Assessment" as:

> Axis I – Clinical Disorders –
>
> 311 Depressive Disorder NOS
> 305.00 Alcohol Abuse
> 309.81 Post Traumatic Stress Disorder With Delayed Onset [31]

---

[28] Exh. 5, pp. 13, 15 (Of particular relevance in this case, this complainant stated, "I could tell he was in one of his bad moods just by the harshness of his words.").
[29] Exh. 5, p. 17.
[30] Exh. 5, p. 20.
[31] Exh. 5, p. 50.

Dr. Truehart's records thereafter record Post Traumatic Stress Disorder (PTSD) with Delayed Onset, after numerous visits. On April 10, 2008, Wayne discussed "Mackie", that "Mackie is probably dead as a result of suicide", and that he had buried a "Semper Fi" journal (that he claimed Mackie sent him) under five feet of dirt on his property, using a backhoe. Dr. Truehart stated that Wayne "feels angry at God", and that he "now believes in [PTSD] whereas in the past he did not."[32] Without going through each and every visit of Wayne with Dr. Truehart, suffice it to say that her records indicate a certain continued diagnosis of PTSD, continued assessment of varying degrees of alcohol abuse, and estrangement from one or more of his children at various times.[33] Wayne also described being injured in Vietnam from a bullet wound to the abdomen ("under flak jacket"), whereupon he was assisted by "Mackie".[34]

In August 2012, Wayne related to Dr. Truehart the Orange Beach incident and reconciliation in its aftermath, stating, "Casey (sic) dropped everything", including the restraining order.[35] Around May 2, 2013, Dr. Truehart's notes indicate that Wayne visited, and noted "anniversaries of combat events, some recent negative dreams. Until then, had been sleeping well."[36] On July 11, 2013, Dr. Truehart wrote that Wayne "does not meet diagnostic criteria for PTSD at this time."[37] Dr. Truehart's records thereafter indicate improvement in Wayne's mental state; although, on April 7, 2014, Dr. Truehart's "current clinic diagnosis" again stated:

---

32 Exh. 5, p. 59.

33 On May 22, 2008, Dr. Truehart recorded: "[Wayne] wants to see his second grandchild who was born to his daughter. He is upset that he hasn't seen his daughter in a year." Exh. 5, p. 67.

34 Exh. 5, pp. 133-135.

35 Exh. 5, pp. 157-158.

36 Exh. 5, p. 188.

37 Exh. 5, p. 195.

"Posttraumatic Stress Disorder (Acute/Chronic, with Delayed Onset)."[38] The same notation appears after a visit on April 18, 2014.

Following Wayne's October 14, 2014 car accident, Kacie requested permission from Wayne to communicate directly with Dr. Truehardt, as part of Kacie's efforts to address Wayne's issues. After Wayne assented, Kacie faxed a five-page letter to Dr. Truehardt on October 19, 2014. In the letter, Kacie describes Wayne as "a pathologic liar", "an alcoholic", and remarked that "his children think an 'intervention' is in order."[39]

On November 14, 2014, Wayne signed an authorization for Dr. Truehart to disclose health care information to Kacie in connection with her treatment of Wayne. Dr. Truehart spoke to Kacie three days later, at which time Kacie related her suspicions that Wayne had been drinking regularly, and her suspicion that Wayne's denials of alcohol consumption were false.[40] Dr. Truehart had another "extensive phone discussion" with Kacie the following day, providing information regarding "Al-Anon in the Northshore area," and the coroner's office phone number in the event Kacie was concerned Wayne was "an imminent threat to himself or others."[41] On November 19, 2014, Kacie called Dr. Truehart: "She reported that she spoke with [Wayne's] brother Bobby today and that Bobby was certain that [Wayne] had never been to Vietnam. Discussed this with her."[42]

Kacie sent a handwritten letter on November 20, 2014, indicating that she had spoken to Bobby, who told her that Wayne had sought his assurance that he would not answer Kacie's calls

---

38 Exh. 5, p. 218.
39 Exh. 5, pp. 228-232.
40 *See* Exh. 5, p. 239.
41 *See* Exh. 5, p. 240.
42 *See* Exh. 5, p. 241.

or emails. Furthermore, the letter stated that Wayne, in addition to denying alcoholism to Bobby, told his brother that he suspected Kacie was planning to leave him and that she was embellishing Wayne's problems to "build a child custody case against him." Kacie inquired, in the letter, whether, instead of being an alcoholic, Wayne "has some psych disorder that leads him to act like a drunk? Is he a psychotic that just happens to drink?" Kacie also advised Dr. Truehart that at the time of his October car accident, Wayne was on the phone with his office employee "Kathy", [43] who (according to Bobby, as related by Kacie) described Wayne as "obviously intoxicated and talking suicidal, and forbidding Kathy from speaking to Bobby or anyone else."[44]

On November 21, 2014, Wayne revoked Dr. Truehart's authority to speak to Kacie, indicating that "he wanted to focus on past combat trauma, and that talking about the numerous other stressors in his life would have prevented him from focusing on his past which is what he wants to work on."[45] Wayne further reaffirmed that he was not suicidal.

**H. February 26 through March 1, 2015**

Much of the trial was spent focused on the days leading up to the shooting of March 1, 2015.[46] Kacie described the preceding Thursday night as a calm evening, wherein Wayne stated, "No more secrets, we're going to be fine", and that they were both going to be "open and honest from now on." Kacie testified, "I was very hopeful." According to Kacie, it was in that spirit that

---

43 It is not known whether this "Kathy" is the "Kathy Hoffman" interviewed by the St. Tammany Parish Sheriff's Office and referenced in Exhibit 3, p. 25. While such may seem likely, the interview of "Kathy" by the Sheriff's Office does not reference the October 2014 accident at all.

44 *See* Kacie's letter, Exh, 5, pp. 242-246.

45 *See* Exh. 5, p. 247.

46 Kacie testified on both days of this trial, first under cross, then in her case-in-chief. Her testimony was also given in an extensive 223 page deposition taken by counsel for the adult Breen children on April 5, 2016 (the entirety of which is Exhibit 24), and her statements to St. Tammany Parish law enforcement officers are provided in the Investigative Case Report, stipulated into evidence as Exhibit. 3. Quotes in this section are from her court testimony.

she asked Wayne to sign the authorization form[47] for release of military records on that Thursday evening,[48] which he did without protest or reluctance.[49] Kacie further testified that the next day, Friday, February 27, 2015, Wayne appeared to be in a good mood, and the two had "a romantic evening."[50]

On Saturday, February 28, 2015, Kacie testified that Wayne "was in a bad mood" all day, while she took their son Aiden to a soccer game and she attended a baby shower. Kacie described Wayne as "terse, withdrawn" during the course of that day, but stated that the two did not discuss the military record issue. That evening, while watching television, Wayne fell asleep with Aiden in the master bedroom. Kacie testified that she awakened Wayne and asked him to take Aiden to his room to sleep for the rest of the night. She further testified that, upon Wayne awakening, he said: "we need to talk", or "I need to talk to you." She testified that she suspected an argument would ensue "from the tone of his voice", and responded, "let's go in the front", meaning the kitchen area of the house.

---

[47] Exh. 11.

[48] Kacie testified, "he was being so kind and gentle" that she then asked him to sign the form, and when he did, she had no doubt that he had in fact served in Vietnam. She stated "his demeanor did not change, he filled it out and signed it, and that was that." Kacie further cited to advice she had previously obtained from Dr. Truehart, regarding whether Wayne was truthful about serving in Vietnam: if asked and he readily agreed to sign the release of his military records, "you have nothing to worry about." Conversely, an indication that Wayne was untruthful could be implied by his refusal or reluctance to sign the form.

[49] Counsel directed the Court's attention to the date by Wayne's signature, which is scribbled. Counsel for the adult Breen children suggest that the date is actually "2/16/15", thus at odds with Kacie's testimony. A full review of the document, however, indicates a lack of clarity in the handwritten numeral "2" elsewhere on the document. It is unclear to the undersigned that the day by the signature is "16" and not "26", although it is also not clear that the digit is indeed "26." Given this lack of clarity, the only testimonial insight regarding the document comes from Kacie, who testified it was Thursday, February 26, 2015, when he signed the document, and dated it accordingly. Wayne's handwriting, particularly with regard to numerals, appears elsewhere in the record. *See, e.g.*, Exh. 12 and 13. However, those numerals do not provide insight in contradicting Kacie's testimony. None of the parties discuss whether February 16, 2015, fell during the mid-February vacation of Kacie, Wayne, and Aiden to Disney World. According to Kacie's testimony on the first day of trial, it did, which makes it less likely that Wayne signed the authorization form on the 16th, in the midst of a vacation with his wife and son.

[50] Kacie testified that she and Wayne had tickets to a comedy concert that evening, but he arrived home from work late and they stayed home that evening.

Kacie testified Wayne was agitated. Once Wayne and Kacie entered the kitchen, he said, "I want that paper back that I signed. I changed my mind, I don't want you to send it." Kacie responded, "too late, I already faxed it." Wayne: "What do you mean?" Kacie: "I already faxed it." Kacie testified that Wayne's anger escalated. She then asked, "What, Wayne? What's it going to say when it comes back?" She described Wayne then as "very angry . . . banging a pen on the table in a clenched fist." She said Wayne stated: "Basic training, rifleman, reserves." Kacie asked, "When were you in Vietnam?", to which Wayne finally responded: "I was never in Vietnam. Are you f---in' happy now?" Kacie then described Wayne as "furious", and that he "vacillated between 'yes' and 'no'" as to Vietnam, indicating that the stories he told were true, then admitting that they were fiction. Kacie asked, "What about Mackie?", to which Wayne responded, "Don't you ever talk about Mackie. Mackie is very f---in' dead. Are you happy?" Kacie, still in the kitchen/breakfast room with Wayne, testified that she wanted to leave, was "afraid", and wanted "to diffuse the situation", so she picked up the keys to her GMC Acadia and began heading toward the garage, where it was parked. Wayne asked, "Where do you think you're going?", following straight behind Kacie, calling her names, and repeating, "Where are you going?"

In the garage, Kacie opened the car door and got in to start the engine. Wayne stated, "You know I can't let you leave", and then reached across Kacie, forcefully ripping the keys out of the ignition. In the process, Wayne's force bent the car key substantially.[51] Kacie testified that Wayne then grabbed her, jerked her out of the car, and she fell down to the floor of the carport. She described Wayne as "like a wild animal", and testified she was terrified, stating, "There was

---

[51] *See* Exh. 1, pp. 2-3; Exh. 3, p. 11.

nothing I could say to make it better. He kept pushing me down," as she tried to rise. According to Kacie, during this confrontation, Wayne repeated, "I'm not letting you leave. You know I can't let you leave . . . ." He then said, "If I let you up you're not going to leave?" Kacie replied, "No." As she rose to her feet, testified Kacie, Wayne "pushed me up against the car, forearms on the sides of my neck." Kacie stated, "I thought he was going to kill me", and wanted him to calm down. Kacie said, "I can't breathe. You're hurting me", but Wayne did not respond or relent.

Kacie testified that she reached down and pulled a pistol[52] kept in the door pocket storage area of the GMC. She said that, at that moment, she "thought he was going to kill me", held the gun to the left side of Wayne's chest, and fired. Wayne fell back away from her, looked at her, and said, "What the f--- are you doing?", then lunged forward toward Kacie. Kacie testified it was then that she fired the second shot, persisting in fear for her life. On that second shot, Wayne fell backwards to the cement floor of the garage.

In the aftermath of the shooting, Kacie testified that she put the pistol down in the GMC and tried calling for help inside the vehicle, but could not get through. She then proceeded immediately inside, pressed the distress button on the home alarm system, and called 911 on the cordless phone. Her conversation with the 911 operator was recorded and admitted into the record herein as Exhibit 9. With the assistance of the 911 operator, Kacie returned to Wayne and attempted to administer CPR, whereupon law enforcement officers arrived at the scene.

---

[52] The handgun was a Beretta 9 millimeter, purchased by Kacie years before and kept in her vehicle for self-defense.

### I. Aftermath

STPSO officials compiled a complete report of their investigation into the incident.[53] It consists of some 97 pages, and includes descriptions of interviews of 22 individuals.[54] The parties also stipulated into evidence the St. Tammany Parish Coroner's Office "Autopsy Protocol" as Exhibit 4. Page 78 of the Investigative Case Report summarizes the investigation in the following manner:

> **CONCLUSION**
>
> Upon the conclusion of this report, the evidence and information that was uncovered during the investigation supported Kacie's account of what happened and did not contradict her claim that she shot Wayne as a result of her being attacked by him and fearing for her life; resulting in a justifiable homicide. Given all facts known to the investigators at the time of this report, probable cause does not exist to arrest Kacie Breen for the shooting death of her husband.

Thereafter, the St. Tammany Parish District Attorney convened a Grand Jury, which returned a "No True Bill" in the matter on April 7, 2016. Prior to that, Kacie was interviewed twice by STPSO personnel, once immediately after the shooting,[55] and again on June 11, 2015.[56] Kacie also appeared on April 5, 2016 (two days before the No True Bill was returned) for a deposition taken by counsel for the adult Breen children in the wrongful death action filed against her in state court. On none of these occasions did Kacie assert her Fifth Amendment right to decline to testify.

---

[53] *See* Investigative Case Report, Exh. 3.

[54] On the morning of Sunday, March 1, 2015, STPSO Detective Walter Matthews contacted Wayne's brother, Robert, and his daughter, Bridget, to advise that Wayne was dead. Detective Matthews records each of them, independently, with the same initial response: "Was it suicide?" *See* Exh. 3, p. 17.

[55] *See* Exh. 3, pp. 7, 14-16.

[56] *See* Exh. 3, pp. 71-75.

## III. CONTENTIONS OF THE PARTIES[57]

It is undisputed that Kacie Breen is the expressly named beneficiary of the two insurance policies. To defeat Kacie's status as beneficiary, the adult Breen children and administratrix Alyce B. Landry invoke the provisions of La. R.S. 22:901, offering the same collection of arguments in support:

(1) Based upon the coroner's report and testimony, the angles of the shots and the powder residue ("soot") do not conform to Kacie's account of the shooting;

(2) Kacie did not act in self-defense, as she was: (a) the aggressor in the events occurring on March 1, 2015, (b) failed to retreat when possible, (c) used excessive force against (d) an unarmed man.

(3) Kacie's credibility cannot withstand inconsistencies and inaccuracies in her deposition testimony, statements to St. Tammany law enforcement, and at trial including: that she was strangled, that she could reach for the gun while pinned in the door of the GMC, that she deleted certain text messages subsequently recovered off of Wayne's cell phone, that she faxed the military record form but did not produce any record of such fax being sent, that she visited Wayne's office on Wednesday seeking a copy of the Knapp contract, that she did not disclose to Dr. Truehart any physical abuse Wayne committed against her, and that she made inappropriate and allegedly ominous

---

[57] In their Pretrial Order (Rec. Doc. 87, p. 5), which governs the trial, the parties agreed that there are only five "Contested Issues of Fact": A, B, C, D, E.

A. Whether Kacie Breen participated in the intentional, unjustified killing of Dr. Breen.
B. Who was the aggressor in this incident?
C. Did Kacie Breen use excessive force?
D. Was Kacie Breen justified from a self-defense standpoint?
E. Whether Kacie Breen use[d] unjustified force.

The parties also concurred that there are no "contested issues of law".

comments regarding a gun given to her as a gift and in a February 8, 2015 email about being "full throttle."[58]

(4) Kacie killed Wayne because of her hunger for insurance policy proceeds, and that these policies were purchased in August 2012[59] during a rift in the marriage and as a condition to reconciliation, and for financial benefit, also as evidenced by Kacie's texts to Wayne in early February 2015 regarding continued payments to his son, Aaron Dylan Knapp, to which Kacie vigorously objected.

## IV. **LAW AND ANALYSIS**

La. R.S. 22: 901(D) represents Louisiana insurance law's version of the "slayer rule", *i.e.*, that one cannot financially benefit from killing the insured. Under La. R.S. 22:901(D)(1), a beneficiary cannot receive life insurance policy proceeds if she is "(a) Held by a final judgment of a court of competent jurisdiction to be criminally responsible for the death, disablement, or injury of the individual insured," or "(b) Judicially determined to have participated in the intentional, unjustified killing of the individual insured."

However, in Louisiana a lethal act of self-defense does not invoke the slayer rule. In 1944, the Louisiana Supreme Court conclusively ruled that "the intentional killing by the beneficiary of the person insured, if committed in lawful self-defense, will not prevent the beneficiary from claiming the proceeds of the insurance on his life." *American National Life Insurance Co. v.*

---

58 Exh. 16, p. 47.

59 In its Complaint (Rec. Doc. 1), Pruco alleges that Wayne applied for the Pruco policy on June 12, 2012, and the policy was issued on August 15, 2012 (see ¶¶ 7 and 8). Wayne designated Kacie the beneficiary on the June 12, 2012 application. In its Complaint (Rec. Doc. 1 in Civ. A. No. 15-6746), Lincoln alleges that Wayne applied for the Lincoln life insurance policy on October 14, 2011, and the policy was issued on or about October 27, 2011. Wayne designated Kacie as beneficiary on the October 14, 2011 application.

*Shaddinger*, 16 So.2d 889, 890 (La. 1944); *see also Provident Life & Accident Ins. Co. v. Carter*, 345 So. 2d 1245, 1246 (La. App. 1st Cir. 1977); *California-Western States Life Ins. Co. v. Sanford*, 515 F. Supp. 524, 526 (E.D.La. 1981) ("If the beneficiary killed the insured in the course of self-defense, for example, he was still entitled to the insurance money.").

Louisiana law has long endorsed a person's right to use lethal force in self-defense, even when only based on a reasonable subjective perception of imminent danger. *See, e.g.*, *Patterson v. Kuntz*, 28 So.2d 278, 282 (La. App. Orleans 1946); *Duncan v. Tanner*, 85 So.2d 865 (La. App. Orleans 1956); *Pearson v. Taylor*, 116 So.2d 833 (La. App. 1959*); Smith v. Delery*, 114 So.2d 857 (La. 1959); *Wilson v. Dimitri*, 138 So.2d 618 (La. App. 4th Cir. 1962).

In Louisiana, the evidentiary significance of a husband's past history of abusive conduct toward his wife who later kills him in asserted self-defense is likewise codified in La. C.E. art. 404(A)(2), providing an exception in domestic violence cases to the prohibition against evidence of the alleged victim's character absent an immediate "hostile demonstration" or "overt act" at the time of the offense. Under art. 404(A)(2), where self-defense is claimed by a wife in justification for her use of lethal force against her husband, his "history of assaultive behavior" is admissible, even absent an immediate "hostile demonstration" or "overt act", to show the dangerous character of the husband.

When the use of force or violence results in a homicide, the standard is stricter than "reasonable and apparently necessary" in determining if the force used was in fact justified. La. R.S. 14:20 states:

A homicide is justifiable:

> (1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.

Under this standard, the use of force or violence is justified in self-defense only if the person reasonably believed that he was in imminent danger of losing his life or receiving great bodily harm and that deadly force was necessary to save his life. *State v. Guinn*, 319 So.2d 407 (La. 1975); *State v. Richardson*, 648 So.2d 945 (La. App. 5 Cir. 1994).

The law in Louisiana is that the standard in determining when a homicide is justified is found in La. R.S. 14:20. The parties agree that this criminal statute is applicable to civil cases. The jurisprudence in Louisiana is well-settled that resort to the use of a deadly weapon to repel an attack is not justified, save for exceptional cases where the actor's fear of danger is not only genuine but is founded upon facts that would likely produce similar emotions in men of reasonable prudence. *Hattori v. Peairs*, 662 So. 2d 509, 514 (La. App. 1st Cir. 1995), *writ denied*, 666 So. 2d 322 (La. 1996).

Louisiana Revised Statute 9:2800.19 refers La. R.S. 14:20, the justifiable homicide statute, to determine whether a defendant in a civil case used reasonable force in defense of a person or property. "Louisiana Revised Statute 14:20(A) sets forth situations in which a homicide may be justifiable, depending on the reasonable belief of the person using force or violence in defense, the danger presented to that person or others, and the need for the use of deadly force." *Shipp v. Landry,* 147 So.3d 721, 726 (La. App. 1st Cir. 2014). The factors the jurisprudence considers in deciding whether the circumstances justified the use of deadly force include: (i) the character and reputation of the attacker, (ii) the attacker's belligerence, (iii) the difference in size and strength between the parties, (iv) the attacker's overt acts or threats of bodily harm, and (v) the possibility

of a peaceful retreat. Many of these are the same factors applicable in any self-defense case. Frank L. Maraist and Thomas C. Galligan, Jr., *Louisiana Tort Law*, § 2.09[2] (2nd ed. 2009). "A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict." La. R.S. 14:21.

**1. Physical Evidence at the Time of the Shooting**

The first argument offered by the adult Breen children under LSA-R.S. 22:901(D)(1)(b) is that Kacie's shooting of Wayne could not possibly have happened as she described, thus, she did not act in self-defense, and her claim that she did so is false. The adult Breen children essentially rely on three planks of physical evidence in this regard: (a) the trajectory of the bullets is inconsistent with Kacie's story, (b) the "soot" marks on Wayne's clothing and body refute her version of events, and (c) her description of how she reached for the Beretta in the pocket container of the door of the GMC is not possible.

St. Tammany Parish Coroner Dr. Michael DeFatta, who examined Wayne's body and issued the autopsy report,[60] testified as to negative toxicology results, meaning no drugs or alcohol were detected in Wayne's system. He further testified as to his findings regarding "Penetrating Gunshot Wounds A" and "B"[61], and the trajectory of their respective bullets. He testified that Wound "A" had a "one centimeter zone of soot with soot-like flakes" at the entrance wound, and the responsible bullet, Projectile "A", entered in the left chest one inch left of the midline and 11 inches from the top of the shoulder, and was recovered from Wayne's body in the right lower back,

---

60 *See* Exh. 4.

61 Dr. DeFatta testified that labeling these bullets "A" and "B" does not necessarily indicate the order in which they were fired.

having "overall travel[ed] left to right, front to back and downward."[62] Wound "B" had a "five [millimeter] zone of soot" at the entrance wound, and the responsible bullet, Projectile "B", proceeded through skin and soft tissue of the left lateral chest, "travelling downward and perforating the spleen", exiting the left lower back, "overall travel[ing] left to right, front to back and slightly downward."[63] Counsel for the adult Breen children spent considerable time at trial, with both Dr. DeFatta and Kacie, attacking her version of events based upon the downward trajectory of these two bullets. In other words, counsel posited that Kacie would have to be above Wayne to have fired these two shots, either standing in a position above him if he were upright, or shooting at him while he laid on the ground.

The trajectory of these shots, however, is consistent with Kacie being in the doorway of the GMC, with Wayne in a loose fitting shirt standing on the garage floor with his arms raised to her neck, as to the first shot; and as to the second shot, with Wayne lunging forward with Kacie still in the doorway of the GMC. While counsel offers alternative explanations, even suspicions, as to the direction of these shots and how they came to be fired at Wayne, there is no testimony or evidence indicating that, more likely than not, Kacie was above Wayne while they were standing face to face, or that Kacie fired at Wayne while he was prostrate on the ground; or that he was not leaning or lunging forward toward her.

As to the soot, the adult Breen children further posit that the greater amount of soot (one centimeter) at Wound "A" would indicate that this shot was fired at closer range than Projectile "B", which left a five millimeter "zone of soot" around Wound "B". According to the adult Breen

---

62 *See* Exh. 4, p. 2.
63 *See* Exhibit 4, pp. 2-3.

Children, this contradicts Kacie's testimony, which appears to indicate that Projectile "B" was fired first, at a closer range. However, Projectile "A" also had to be fired at close range (albeit somewhat further away) to leave a "zone of soot." Further, it should be noted from the several photographs in evidence, that this altercation occurred in the confined space between the vehicles parked in the two-car garage that night: the GMC, with its driver's door open, and a covered Mercedes. Accordingly, the entire exchange culminating in both of these shots being fired was in close quarters.[64] Moreover, the adult Breen children offer no testimony, expert or otherwise, to establish that this difference in the zone of soot, whether because of distance, the loose shirt Wayne was wearing, the properties of the firearm, etc., makes it reasonably probable and, more likely than not, that Kacie's version of events is impossible and false.

Kacie was extensively cross-examined regarding her position in relation to the open door of the GMC at the time she reached for and obtained the pistol from its storage pocket. Counsel attempted to pinpoint the location of Kacie's head at that very split second suggesting that her arm would have to be incredibly long to reach the door pocket.[65] However, the accuracy of such an exact "freeze frame" analysis is problematic, as Kacie and Wayne were engaged in a frantic and violent struggle, during which their bodies were not static, but were rather moving fluidly as they grappled with one another. It is hard to expect Kacie to remember, in great detail, the location of her body at the very moment she pulled the pistol. Suffice it to say, it is clear that the Beretta in the door of the GMC wound up in Kacie's hand at some point after she went to the garage and opened the door to the vehicle. Even should the Court doubt Kacie's position in the door frame at

---

64 *See* photographs, Exh. 1, pp. 1, 4 and 5.

65 *See* Exh. 8, p. 2.

the exact time she reached into the door pocket, this discrepancy does not refute her testimony that she and Wayne were engaged in a physical struggle in the area of the open door, and, during that struggle, that she grabbed the pistol, only moments before pulling its trigger.

**2. Unjustified Killing or Self Defense**

The adult Breen children and administratrix Alyce B. Landry claim that Kacie was the aggressor, that she failed to retreat when possible, and used excessive force against Wayne, who was then unarmed.

These parties assert that Kacie was the aggressor because she awakened Dr. Breen, who was asleep, left bluntly directive text messages for him approximately three to four weeks prior to March 1st, in relation to the Knapp issue, and that Wayne had left the matrimonial domicile twice in the preceding years, during rifts in the marriage. These parties also cite the trial testimony of Jeffrey Dunbar, Wayne's son-in-law and husband to daughter Bridget, that Kacie appeared to be the more dominant or controlling half of the couple.

The simple act of awakening one's spouse so that their child could be returned to his bedroom for the night hardly makes one an aggressor. In fact, Kacie testified that from time to time, Wayne and Aiden fell asleep watching television in the master bedroom, and Wayne would return the sleeping Aiden to his room on such occasions. The argument at trial that Wayne should not have been disturbed because of his foul disposition and, particularly, in light of Kacie's testimony that he had been in a foul mood all day, is without merit.

Likewise, that Kacie sent profanity-laced bluntly-worded text messages directing him as to how to proceed with regard to the Knapp matter in early February, carries little evidentiary weight as to the events that occurred in the early morning of March 1, 2015. From February 6,

2015 forward, the evidence indicates that Kacie sought to combat and terminate demands by Knapp for Wayne's money. Wayne, having finally admitted to fathering a child out of wedlock decades prior, and, more importantly, that he had failed to disclose this fact to his wife of several years, was hardly in a position to refute or rebuff Kacie's directives. Indeed, Wayne seemed in agreement with Kacie's asserted strategy of hiring legal counsel and seeking termination, judicially or otherwise, of any further financial obligation. Although the Knapp issue remained the subject of daily communication up through the end of February, the evidence does not suggest Wayne and Kacie arguing about it after he finally admitted to the truth of the matter in the first week of that month. Rather, it seems the couple shared a community of interest, gearing up for a legal battle against the Knapp claim.

Interestingly, the only evidence that Kacie was controlling, spoke down to or dominated Wayne came from Jeffrey Dunbar, and some of Wayne's children.[66] The evidence also suggests that, during times of tension in the marriage, either Wayne left the matrimonial domicile to stay in a hotel, or more often, Kacie spent time at her mother Cheryl Magee's house.

The adult Breen children and administratrix Alyce B. Landry also claim that Kacie "failed to retreat when possible", however, the evidence is clearly the opposite. Kacie testified that following Wayne's incomprehensible vacillations about whether he was in Vietnam or not, she picked up her car keys and headed to the garage to get into the GMC. The evidence further indicates that it was Wayne who followed her to the garage, whereupon he asserted he could not allow her to leave, and made physical contact with her to prevent her exit. Thus, regardless of

---

[66] *See* fn. 10.

which person was the initial aggressor, the evidence supports Kacie's account that she left the presence of Wayne in the kitchen/breakfast area to exit from the garage.

In this case, where the physical and scientific evidence is scant, Kacie's testimony plays a pivotal role. She testified that Wayne was in a rage, and had forcefully placed both arms tightly on either side of her neck.[67] This occurred following his pinning her to the floor, but then allowing her to get up. Given his angry rage in the kitchen, as well as his incomprehensible and/or contradicting assertions regarding his Vietnam experience, this particular confrontation had surely entered unchartered waters in the recurring marital strife previously existing between the couple.

Under the circumstances, Kacie's testimony that she feared for her life and felt compelled to use the firearm in self-defense appears reasonable. Given the immediacy of the situation, the history of domestic violence, Wayne's fear of being exposed as a fraud, and the relative size of the two (Wayne was approximately 5'10" to 6'1" and Kacie approximately 5'6"),[68] the Court finds Kacie's testimony credible. Moreover, given Wayne's size and his superior strength, as demonstrated by the testimony of Wayne having held Kacie in the past in a headlock, the fact that he was not armed does not discount the reasonableness of Kacie's concern for her life under the circumstances.

---

[67] The adult Breen children and Landry argue that, because Wayne's hands were not visible and Kacie testified his arms were squeezed on either side of her neck, it is not credible that she believed she was being strangled. This argument assumes that one cannot be strangled, or be placed in fear of strangulation, without placement of the hands around the neck. The Court does not agree with this proposition, as it is clear that any pressure on the neck sufficient to impact the windpipe or impair the ability to breathe makes one apprehensive of suffocation.

[68] Testimony of Kacie:

Q: "How tall are you, Ms. Breen?
A: About 5'6.
Q: And how tall was your husband?
A: About maybe 6-foot, 6-foot 1."

*See also* Exh. 4, Autopsy Protocol (measuring Wayne's body as 70 inches, or 5'10", and 188 pounds).

In short, although the adult Breen children and administratrix Alyce B. Landry, by selecting shards of evidence, have introduced a possible, alternative scenario to explain the critical events of March 1, 2015, they have failed to persuade the Court that their version is *more likely than not* the truth, over Kacie's testimony.

**3. Credibility**

Without much in the way of physical evidence to support their theory of the shooting, the adult Breen children and Landry spent much of trial attempting to tarnish Kacie's Breen's general credibility, pointing out certain discrepancies from her deposition testimony, and other inconsistencies, improbabilities, and unlikely coincidences such that Kacie's testimony should not be accepted as credible. One such example is the issue of deleted text messages vaguely raised at trial. The adult Breen children make much of the fact that certain text messages recovered off of Wayne's cell phone had been deleted on Kacie's phone, insinuating that Kacie's nefarious motivation to "cover up" something suggests she is being untruthful. First, the Court notes the testimony that one of Kacie's phones had been confiscated by Wayne earlier in the week prior to his death, and that she had obtained a new phone on Friday, February 27, 2015.[69] Be that as it may, it would truly be disingenuous of Kacie to attempt to cover up text messages by deleting them from her phone, knowing that they could easily be recovered from Wayne's phone, and would quickly be sought by investigators upon his death, especially coming at the hands of his spouse. Thus, the Court cannot infer that, even had Kacie deleted text messages, her purpose in doing so was to hide or conceal a plan to kill Wayne.

---

[69] *See* Exh. 3 at p. 14. Kacie testified that, from time to time, Wayne became suspicious and frustrated with her, at which time he would confiscate her cell phone in an attempt to hinder her communication with others. On those occasions, such as Friday, February 27, 2017, Kacie would obtain a new phone.

Likewise, the adult Breen children argue that, although Kacie told Wayne that she faxed the request for military records form shortly before their altercation led them to the garage, Kacie could not produce any record or documentation of such fax being sent, either on the Breen home fax machine or from the intended recipient. Nonetheless, in these proceedings, Kacie is entitled to rely on the undisputed fact that she is the expressly-named beneficiary on the policies, and does not have the burden of proof. Indeed, the adult Breen children do not bring to this Court a return on a subpoena to the National Archives and Records Administration ("NARA"), nor even a return subpoena served on Kacie, that represents the fact that no such documentation exists. Although Kacie testified that she does not recall, and does not possess, a fax receipt document generated by the Breen fax machine, the adult Breen children do not identify what type of fax machine it was, whether such fax machine generates such receipts, whether the fax machine was likely loaded with paper such that a receipt could be generated, and whether the fax machine was, to any extent, functioning properly or improperly such that a receipt would absolutely exist if Kacie was truthful in her statement that she had faxed the form. Furthermore, even had Kacie not faxed the form but said she did so to procure a truthful admission from Wayne, such would not justify a physical attack by Wayne on his wife.

The adult Breen children also argued at trial that Kacie's visits to Wayne's office on the days before the weekend of the shooting were not for the purpose Kacie stated, which was to find the original signed contract in the Knapp matter. Rather, they claim that Kacie was searching for life insurance policies and/or Wayne's will, obviously with an idea of securing financial information relevant to the upcoming murder she had planned. The adult Breen children maintain that the best evidence supporting this allegation is that Kacie and Wayne had already procured a

copy of a purported "contract" from Attorney Mark Jolissiant when he met them at Starbucks on February 5, 2015. However, the testimony of Lakeitha Cole makes clear that Wayne controlled access to his office and papers, and specifically contacted Cole to prevent Kacie from entering his office without him being there.[70] During the times Kacie was going through files and papers in Wayne's office, Wayne was present or close by, thus with knowledge of Kacie's viewing of his papers. Moreover, given the age and vagueness of the one and a half page "contract" produced during trial, it is not unreasonable that Kacie, and Wayne as well, believed something more, in the way of documents regarding the Knapp matter, had to exist, such that his "obligation" to his child with Knapp could be turned over to counsel. It should be noted that, consistent therewith, Kacie, at various times during the month of February 2015, had vigorously urged Wayne to retain aggressive counsel to review the entire Knapp matter and bring it to a conclusion, and thus the collection and review of documents by her and Wayne is consistent with such effort.

The adult Breen children also try to cast doubt on Kacie by noting that she did not discuss Wayne's physical abuse of her with others, and citing, in particular, the lack of reference to abuse in Kacie's letter to Dr. Truehardt. Kacie explained this, however, testifying that she did not tell her mother or co-workers of Wayne's abusive conduct, because she was "embarrass[ed]" and "ashamed", and did not want to hurt Wayne's "outstanding reputation in the community." Kacie further "thought no one would believe [her]", particularly given Wayne's reputation among his patients as a gentle OB-GYN. In addition to these reasons, Kacie's testimony of the actual abuse is well supported by that of her mother, Cheryl Magee, and her son, Christopher Hickman,[71] as

---

[70] *See* Exh. 15.
[71] *See* Exh. 5, p. 9.

well as records of "abusive and derogatory behavior",[72] including the Orange Beach incident[73] and complaints from nurses at Wayne's work.[74] Thus, the Court finds that not only are Kacie's allegations of physical abuse credible, her reasons for not complaining to her mother, co-workers, Dr. Truehart, or anyone else are as well. When asked why she didn't simply leave Wayne, Kacie stated: "Because I loved him, and felt sorry for him. I thought he was ill, and my job was to help him get better", referencing Wayne's PTSD as a result of his Vietnam combat experience. Again, this explanation seems reasonable coming from one in the circumstances of Kacie.

The adult Breen children also claim that Kacie responded inappropriately to a joke about Wayne's gift to her of a handgun in 2014, and also in a February 8, 2015 email (related to the Knapp matter) wherein she states: "you probably don't want to see full throttle."[75] On or about September 11, 2014, Kacie's Facebook comments include birthday greetings she received from friends, and, upon stating that Wayne had given her a firearm, a friend by the name of Shaunta McCraney-Cox stated: "HAPPY BELATED BIRTHDAY KACIE MAGEE BREEN HOPE u had a great day. Doc [Wayne] should know better giving you that gift." In response to this post, Kacie stated: "Thank you, Shaunta McCraney-Cox. And you would THINK he would know better …".[76] While the adult Breen children assert that these comments confirm Kacie's intent to shoot Wayne, they seem rather, in hindsight, to be a terribly ironic attempt at "black humor."[77] Moreover, the

---

72 *See* Exh. 5 p. 1.
73 *See* Exh. 17 and 18.
74 *See* Exh. 5.
75 Exh. 16, p. 47.
76 *See* Exh. 8, p. 22 and Exh. 3, p. 86 (from the STPSO Investigative File). This comment, and the numerous personal text messages and emails introduced into evidence in this case, are yet further examples of the pitfalls of embarrassing comments preserved in perpetuity, for later scrutiny, when an oral conversation in person or by telephone would have been more advisable.
77 Meriam Webster definition: "humor marked by the use of usually morbid, ironic, grotesquely comic episodes."

"joke" about the firearm being an unwise gift from Wayne originated not with Kacie herself, but with her friend. Furthermore, should Kacie have planned and intended to shoot Wayne without justification, joking about it via social media in the preceding months would hardly seem wise, were she intending later to fabricate a story of self-defense.

In addition, the adult Breen children and Landry highlight a remark made by Kacie during her affair in 2010, whereby she emailed her extramarital companion: "[Wayne's] crazy ass is wayyyy close to the deep end and u know me being the bitch I am just keeps on a pushing … can't resist." According to the adult Breen children and Landry, this email evidences not only Kacie as the aggressor in the relationship, but also her intent and proclivity to "bait" Wayne into a rage. While such may have been the case in 2010, and may have perhaps remained the case in 2015, the email exchanges also indicate that Wayne then forbade Kacie from communicating with her companion,[78] and had "ripped the charger prongs" out of the cell phone.[79] Kacie also referenced Wayne "going thru my email and searches when he asked for my phone to supposedly take pics of me and the baby."[80] Kacie's extramarital relationship ended in December 2010.[81] Even if relevant to the events of February 2015, the description of marital turbulence in the Fall of 2010, thus evidenced by Kacie's extramarital affair, are hardly sufficient to provide motivation for her murder of him on March 1, 2015, given all of the intervening factors, including an extramarital affair of Wayne's own in 2012, repeated reconciliations, the October 2014 car accident, the Knapp issue, and the discovery of Wayne's false claim about having fought in the Vietnam War.

---

78 *See* Exh. 3, p. 96.
79 Exh. 3, p. 91.
80 Exh. 3, p. 94.
81 Exh. 3, p. 97.

At trial, counsel for the adult Breen children also questioned Kacie about a type of phone device known as a "spoof card",[82] which apparently allows one to identify the persons to whom telephone numbers are assigned which do not appear by name in the phone. At trial, Kacie admitted to having purchased a "spoof card", and told St. Tammany Parish detectives "she used the card in an attempt to identify some telephone numbers that were in Wayne's phone and the ones that appear to be from the hospital to Wayne's cell. It was to clarify [Wayne] was at work, when he said he was at work."[83] Nevertheless, while Kacie was on the stand enduring cross-examination, counsel implied that the "spoof card" could be used by a person to place a call from one phone, and have the recipient receive an indication that the call was from elsewhere. In other words, counsel suggested that the "spoof card" could be used to conceal or mask the origin of the call and replace it with the identification of a different caller. This line of questioning appeared designed to attack Kacie's credibility regarding her claim of having overheard the initial phone message about the Knapp matter purportedly left for Wayne by attorney, Mark Jolissiant.[84] Despite counsel's implication that Kacie, using the "spoof card", could have placed such a call to Wayne's cell phone, thus igniting the Knapp matter, the Court has no evidence whatsoever: (1) that the "spoof card" is capable of such function; (2) that the "spoof card" is capable of converting the sound of one voice to another (particularly a woman's voice into a man's); (3) how Kacie (or someone acting at her insistence) already knew about Wayne's secret son with Mary Grace Knapp in order to place such a call; and (4) why Kacie would choose to confront Wayne by claiming she heard Jolissiant's call, rather than simply confronting him directly. After all, it is the contention

---

82 *See also* Exh. 3, p. 74.
83 Exh. 3, p. 74.
84 Mr. Jolissiant testified at trial that he did not leave such a message.

of the adult Breen children that it was Kacie who was not intimidated by, and talked down to, Wayne. Though intriguing, the Court is left to wonder about the relevance of the "spoof card" line of questioning.

The adult Breen children also do not mention, and thus fail to explain, other evidence that supports Kacie's story, particularly the bent car key, the fact that Wayne had signed the release form for his military records only days before (regardless of the actual date), that the military record release form was found by law enforcement in the manila envelope in the kitchen (as Kacie said), and that Wayne's overall conduct, both at work and at times at home, were sufficient to cause Kacie and others to "fear" him.[85]

The most important fact overlooked by the adult Breen children is that, shortly before Wayne's death in the early morning hours of March 1, 2015, he was faced, for the very first time, with an unmasking of the most critical lie in his life. The record is clear that, for years, Wayne hid behind an elaborate fabrication of combat service in Vietnam, and that he suffered from resulting PTSD, which then provided cover for disturbing and abusive conduct at home and at work. Wayne became so convinced that his lie was true that he was even capable of convincing Dr. Truehardt, a trained mental health professional, that he had, in fact, fought in Vietnam and did indeed suffer from PTSD. At the very moment Kacie indicated she had faxed the form requesting military recordings to the NARA, Wayne's adult life cover was blown: not only would he be exposed as a liar to Kacie and his family, he lost whatever explanation or justification he could ever offer regarding his conduct at home and at work; and, moreover, he would be disgraced as a fraudulent

---

[85] *See, e.g.*, complaint letters of nurses, Exh. 5, pp. 7-20; Lakeitha (Chappell) Cole testimony, Exh. 15, pp. 35, 42-47; and letter from Wayne's daughter Bridget, Exh. 10 (wherein she describes "walking on egg shells" while living at home with Wayne).

"stolen valor" perpetrator among most everyone he knew, including his patients, co-workers, colleagues in the medical profession, and members of the St. Tammany Parish community, in which he was relatively well known and liked. Given the high stakes that evening, and the fact that Kacie had always accepted and never previously confronted Wayne about the truthfulness of his representations concerning combat service in Vietnam, it is credible that Wayne's reaction would be as Kacie described, and that his demand that she not leave could be interpreted as a threat in more than one way.

For these reasons, the Court, again, arrives at the same conclusion: that, while the adult Breen children have presented an alternative version of events, that version is not more likely, or probable, than the version offered by Kacie to St. Tammany Parish law enforcement, as well as to this Court.

**4. Financial/Life Insurance Motivation**

The adult Breen children and administratrix Alyce B. Landry further asserted at trial, and in their briefing, that Kacie sought to recover insurance policy proceeds and other financial benefits as a result of Wayne's death. The insurance policies at issue, however, were applied for in October 2011 (Lincoln National) and June 2012 (Pruco),[86] long before the issues arose between Kacie and Wayne in 2015 (i.e., the Knapp issue and the Vietnam military service record). Through questions on cross examination, counsel for the adult Breen children suggested that as part of the reconciliation in August 2012 after the Orange Beach incident and Kacie's filing of the "Petition for Protection from Abuse" in the 22nd Judicial District Court, and as a precondition to such reconciliation and sealing of the state court record, Kacie demanded and procured from Wayne

---

[86] *See* Exh. 12 and 13.

designation as his beneficiary under the Lincoln and Pruco life insurance policies. This theory, however, also fails, as Wayne applied for the two policies long before the Orange Beach incident in July 2012, and he designated Kacie the beneficiary in each as part of the application, and not later between the time of their return from Orange Beach and their reconciliation.

The St. Tammany Parish Sheriff's Office investigated these factors as well, finding:

> Also as part of this investigation, Detective Stefan Montgomery conducted a financial background check on both Wayne and Kacie Breen. As a result, Detective Montgomery determined that Wayne Breen maintained primary control of the finances. Detective Montgomery did not find any significant changes in spending patterns by Kacie Breen. This included any movement of monies, or unexplained purchases in the months before, during, or after Wayne Breen's death. Also there were no life insurance policies discovered that were purchased recently, showed any changes to beneficiaries, or were to expire on a date which indicated that the timing of Wayne's death was suspicious. In fact, there were no life insurance policies found that are set to expire anytime in the near future.

Thus, though Kacie is indeed the beneficiary of Wayne's life insurance policies at issue, there is no evidence to suggest a financial motive for her to plan and execute a scheme to kill him, particularly with a firearm by her own hand, to claim life insurance payments or gain a financial windfall.

## CONCLUSION

In this interpleader action, the burden has always been on the non-beneficiaries, i.e., the adult Breen children and administratrix Alyce B. Landry, to prove under LSA-R.S. 22:901(D)(1)(b) that Kacie Breen "participated in the intentional, unjustified killing of the individual insured, i.e., her husband." Otherwise, Kacie Breen is entitled to rely upon her status as the designated express beneficiary under the two part life insurance policies at issue herein. The Court finds that, although alternative theories, suspicions, scenarios, and other innuendoes were

offered to explain the events in the early morning hours of March 1, 2015, the adult Breen children and administratrix Alyce B. Landry have not convinced the Court, by a preponderance of the evidence, that any of these alternative scenarios are more likely than not what happened in fact. Though certain pieces of evidence might exist upon which another explanation might be offered, even more facts exist which tend to confirm Kacie Breen's description of the events leading up to and occurring in the early morning hours of March 1, 2015. Because Kacie Breen is the named beneficiary, and the adult Breen children and adminstratrix Alyce B. Landry have not met their burden under the statute, Judgment is entered herein in favor of Kacie Breen, as a claimant to the funds placed on deposit in this Court by plaintiffs-in-interpleader, Lincoln National Life Insurance Company and Pruco Life Insurance Company.

New Orleans, Louisiana, this 9th day of June 2017.

**KURT D. ENGELHARDT**
**United States District Judge**